**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**EASTERN DIVISION**

**CLIFF HARDY**                                                                                          **PLAINTIFF**

**V.**                                                                    **CIVIL ACTION NO. 1:08-CV-28-SA-JAD**

**CITY OF TUPELO, MISSISSIPPI**                                                          **DEFENDANT**

## MEMORANDUM OPINION

Before the Court is Defendant's Motion for Judgment as a Matter of Law and/or Motion for

a New Trial or Remittitur [114], and Plaintiff's Motion for Back Pay and Front Pay [116]. For the

reasons stated below, Defendant's Motion for Judgment as a Matter of Law is denied, Defendant's

Motion for a New Trial is denied, and Defendant's Motion for Remittitur is granted in part. The

Court will address Plaintiff's Motion for Back Pay and Front Pay upon the resolution of outstanding

issues regarding Defendant's Motion for Remittitur.

### I. Factual and Procedural Background

On May 28, 2006, officers of the Tupelo Police Department (the Department) detained

Jamison Shells on suspicion of driving under the influence and leaving the scene of an accident in

which a child on a bicycle was struck by an automobile. After Shells was detained, the Deputy

Chief of the Department, Robert Hall, an African-American man, ordered Shells' release. The Chief

of Police, Harold Chaffin, subsequently suspended Hall with pay pending the results of an

investigation into his actions. After an investigation by an outside agency, the Chief demoted Hall

to the rank of Captain.

On October 12, 2006, the City Council of Tupelo, Mississippi, held a community meeting

for the purpose of discussing race relations. Plaintiff, Cliff Hardy, a white officer, gave a public

statement in support of Hall at the meeting. At that time, Plaintiff held the rank of Captain. He was

the Department's internal affairs investigator, and he filled a variety of public relations positions. At the meeting, Plaintiff claimed that Hall, his close friend, had been "persecuted" during his tenure as Deputy Chief. Plaintiff suggested that he believed Hall, an African-American man, had been targeted for investigation and demotion because of his race. Plaintiff also related an encounter that he had with investigators from the Mississippi Bureau of Investigations (MBI) suggesting that he had been mistreated because of his support for Hall.

On October 20, 2006, Robert Hall was indicted for feloniously assisting Shells to avoid arrest and obstructing justice.

On November 7, 2006, the Chief of Police removed Plaintiff from his responsibilities as internal affairs investigator. The Chief cited Plaintiff's lack of objectivity as the reason for his removal from internal affairs.

On March 2, 2007, Robert Hall pled guilty to misdemeanor charges of accessory after the fact and obstruction of justice. As a condition of his plea, he resigned his position with the Department. On March 5, 2007, the Chief of Police removed Plaintiff from his public relations responsibilities and reassigned him to the Tupelo Apartment/Housing Authority Patrol. Four days later, Plaintiff tendered his notice of retirement, effective May 1, 2007. He had accrued sufficient leave time that he was not required to work until the effective date of his retirement.

On February 11, 2008, Plaintiff filed this lawsuit, alleging that the City of Tupelo constructively discharged him in retaliation for his speech, in violation of Title VII and the free speech provisions of the First Amendment. On June 26, 2009, the Court denied Defendant's Motion for Summary Judgment as to the First Amendment and Title VII claims. See Hardy v. City of Tupelo, Miss., 2009 U.S. Dist. LEXIS 55836 (N.D. Miss. June 26, 2009).

On July 10, 2009, the Court denied Plaintiff's Motion in Limine as to evidence of Robert Hall's indictment and guilty pleas and denied Defendant's Motion in Limine as to evidence regarding other claims of racial discrimination in the Department, including allegations that officers consider race and prestige in applying their discretionary authority. The Court held that evidence as to Hall's indictment and guilty plea and as to the Department's handling of other exercises of discretionary authority were relevant to the issue of the reasonableness of Plaintiff's belief that the Department was engaged in an unlawful employment practice. The Court invited the parties to submit drafts of limiting instructions for use at trial. Finally, the Court granted Defendant's Motion in Limine, prohibiting the admission of evidence concerning a Cultural Diversity Assessment Report as the report did not comply with the requirements of the public records exception to the hearsay rule.

Trial commenced on July 20, 2009, and on July 24, 2009, the jury returned a verdict for Plaintiff as to both the First Amendment and Title VII retaliation claims. The jury also found that Plaintiff had been constructively discharged, and they awarded Plaintiff $100,000.00 for lost income and $200,000.00 for mental anxiety.

On August 7, 2009, Defendant filed its Motion for Judgment as a Matter of Law or, alternatively, Motion for a New Trial or Remittitur, which the Court now addresses.

## II. Judgment as a Matter of Law

### A.    *Rule 50 Standard*

Federal Rule of Civil Procedure 50 contains the applicable standard for consideration of a motion for judgment as a matter of law. It states:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the

party on that issue the court may:

    (A)    Resolve the issue against the party; and

    (B)    Grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

FED. R. CIV. P. 50(a)(1). When a party renews a motion for judgment as a matter of law after trial, "in ruling on the renewed motion, the court may: (1) allow judgment on the verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." FED. R. CIV. P. 50(b).

A motion for judgment as a matter of law, made after the jury has returned a verdict, is a challenge to the legal sufficiency of the evidence. Stoddard v. W. Telemarketing, L.P., 316 Fed. Appx. 350, 353 (5th Cir. 2009); Int'l Ins. Co. v. RSR Corp., 426 F.3d 281, 296 (5th Cir. 2005). It is not the Court's job "to weigh conflicting evidence and inferences or to determine witness credibility; that responsibility lies with the jury alone." Saucier v. Coldwell Banker Joseph M. Endry Realty, 302 Fed. Appx. 302, 304 (5th Cir. 2008) (citing Miller v. Butcher Distribs., 89 F.3d 265, 268 (5th Cir. 1996)). In reviewing the jury's decision, the Court's role is "to ask whether a reasonable jury could have reached the same result." Jordan v. Ector County, 516 F.3d 290, 300 (5th Cir. 2008). The jury's verdict must be upheld, "unless there is no legally sufficient evidentiary basis for a reasonable jury to have found for the nonmovant." Adams v. Groesbeck Indep. Sch. Dist., 475 F.3d 688, 691 (5th Cir. 2007) (citing FED. R. CIV. P. 50(a)(1); Int'l Ins. Co., 426 F.3d at 296; Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir. 1969)). The Court must "consider all of the evidence in the light most favorable to the nonmovant, drawing all reasonable factual inferences in that party's favor." Torns v. Pennington, 2008 U.S. Dist. LEXIS 69023, *3 (N.D. Miss. Sept. 11, 2008) (citing McCrary v. El Paso Energy Holdings, Inc., 209 F. Supp. 2d 649, 651 (N.D. Miss. 2002)).

**B.** **_First Amendment Retaliation Claim_**

To prevail on a First Amendment retaliation claim, a plaintiff must show:

(1) [he] suffered an adverse employment decision, (2) [his] speech involved a matter of public concern, (3) [his] interest in commenting on matters of public concern outweighs [his] employer's interest in promoting efficiency, and (4) [his] speech motivated the adverse employment decision.

Blackwell v. Laque, 275 Fed. Appx. 363, 368-69 (5th Cir. 2008) (citing Stotter v. Univ. of Tex. at San Antonio, 508 F.3d 812, 825 (5th Cir. 2007)). Defendant argues that Plaintiff's First Amendment retaliation claim fails as a matter of law for four reasons: 1) no adverse employment action took place; 2) the Plaintiff's speech was not on a matter of public concern; 3) Defendant's interest in effective public service outweighs Plaintiff's interest in free speech; and 4) no causal connection existed between Plaintiff's speech and Defendant's reassignment of Plaintiff.

*1. Adverse Employment Action*

In order to sustain a claim of First Amendment retaliation, a plaintiff must prove that an adverse employment action was taken against him. Blackwell, 275 Fed. Appx. at 368-69; McCoy v. City of Shreveport, 492 F.3d 551, 562 (5th Cir. 2007). "[T]he scope of harm actionable under the First Amendment [is] broader than actual or constructive discharge from employment." Pierce v. Tex. Dep't of Crim. Justice, 37 F.3d 1146, 1149 (5th Cir. 1994) (citing Rutan v. Republican Party, 497 U.S. 62, 74, 110 S. Ct. 2729, 111 L. Ed. 2d 52 (1990)). "Adverse employment actions are discharges, demotions, refusals to hire, refusals to promote, and reprimands." Id. The list is not exclusive. Sharp v. City of Houston, 164 F.3d 923, 933 n. 21 (5th Cir. 1999).

A transfer may qualify as an adverse employment action. Sharp, 164 F.3d at 933. "To be equivalent to a demotion, a transfer need not result in a decrease in pay, title, or grade; it can be a demotion if the new position proves objectively worse - such as being less prestigious or less

interesting or providing less room for advancement." Id. (citing Forsyth v. City of Dallas, 91 F.3d 769, 774 (5th Cir. 1996)).

When the Plaintiff spoke at the community meeting, he was the Department's internal affairs officer, and he also served in a variety of public relations positions. First, the Chief removed Plaintiff from his duties as an internal affairs officer. Then he removed Plaintiff from the public relations positions and reassigned him to a housing and apartment patrol, in which he and one other officer were responsible for responding to calls from apartment complexes.

Plaintiff testified that his work as an internal affairs officer was very important to him because he viewed it as a way of making positive changes in the Department and cultivating public trust in the Department. The Chief of Police described Plaintiff's public relations duties as significant positions in dealing with the public.

Plaintiff testified that he believed he would be in danger at the apartment patrol because the position involved dangerous domestic violence calls, and he did not believe that he would receive support from other officers. Before Plaintiff was reassigned to the apartment patrol, he was not required to wear a uniform, and he had supervisory responsibilities and a take-home car. However, in the apartment patrol position, he would have been required to wear a uniform, and he would have lost both the supervisory duties and the take-home car. More than one witness testified that the apartment patrol was currently assigned to officers lower in rank than the Plaintiff would be if he were still employed with the Department. Additionally, Plaintiff would have been required to answer to the shift commander, who might hold a lower rank than Plaintiff's.

In light of the above evidence, a reasonable jury could find that removal of Plaintiff from internal affairs duties, reassignment of Plaintiff to the apartment patrol, or both were adverse

employment actions. Therefore, Defendant's Motion for Judgment as a Matter of Law on this basis is denied.

2.    *Public Concern*

Defendant argues that Plaintiff's speech was not on a matter of public concern because it was motivated by his friendship with Robert Hall, citing Dodds v. Childers, 933 F.2d 271, 274 (5th Cir. 1991). In Dodds, a community college cut back its cosmetology program and eliminated an instructor's job. Id. at 272. The instructor complained that her position was being eliminated for the personal gain of the college dean's relative. Id. She later filed suit claiming that she was fired because of her speech. Id. at 272-73. The Court noted that "issues rise to the level of public concern if an individual speaks primarily as a citizen rather than as an employee, or *if the information conveyed would be of relevance to the public's evaluation of the performance of governmental entities*." Id. at 273 (emphasis added) (internal quotations and footnotes omitted). After analyzing the content of Dodds' speech, the Court held that it concerned a mere private grievance, rather than a matter of public concern. Id. at 274. Therefore, the speech was unprotected, and the Court did not address the interest-balancing element of a First Amendment retaliation claim. Id. at 275.

In the case *sub judice*, Plaintiff's speech did not address a mere private grievance. Plaintiff spoke at a town hall meeting called for the express purpose of discussing racial reconciliation in the Tupelo community. Plaintiff stated that he wished to address "the persecution of Robert Hall," and he compared the Department's handling of the Robert Hall matter to "times past when anyone of color challenged authority and 'went too far.'" Further, Plaintiff testified that his purpose in speaking at the meeting was to let the public know that there were, in his opinion, racial problems in the Department that needed to be addressed.

Therefore, Plaintiff's speech concerned information relevant "to the public's evaluation of the performance of governmental entities," rather than a mere private grievance. Id. at 273. "[S]peech related to racial discrimination almost always involves matters of public concern." Blackwell, 275 Fed. Appx. at 369; see also Victor v. McElveen, 150 F.3d 451, 456 (5th Cir. 1998) (characterizing "a protest against racial discrimination" as "inherently of public concern"). Therefore, if Plaintiff was "motivated, at least in part, by a desire to remedy racial discrimination" his "speech involved a matter of public concern." Blackwell, 275 Fed. Appx. at 369. Such allegations are "inherently of public concern." Victor, 150 F.3d at 456. Therefore, Defendant's Motion for Judgment as a Matter of Law on this basis is denied.

   *3.     Interest Balancing*

Generally, the Supreme Court has held that speech is protected by the First Amendment when the interests of the employee "as a citizen in commenting upon matters of public concern" outweigh the interests of the state "as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968). Applying Pickering, the Fifth Circuit Court of Appeals has stated that the Court is to consider the following non-exclusive list of factors:

> (1) the degree to which the employee's activity involved a matter of public concern; (2) the time, place, and manner of the employee's activity; (3) whether close working relationships are essential to fulfilling the employee's public responsibilities and the potential effect of the employee's activity on those relationships; (4) whether the employee's activity may be characterized as hostile, abusive, or insubordinate; (5) whether the activity impairs discipline by superiors or harmony among coworkers.

Jordan, 516 F.3d at 299 (quoting Brady v. Fort Bend County, 145 F.3d 691, 707 (5th Cir. 1998)).

In balancing the parties' interests against one another, the Court "must remain mindful that creating room for free speech in a hierarchical organization necessarily involves inconveniencing

the employer to some degree." Salge v. Edna Indep. Sch. Dist., 411 F.3d 178, 192 (5th Cir. 2005) (citations omitted).  However, "because police departments function as paramilitary organizations charged with maintaining public safety and order, they are given more latitude in their decisions regarding discipline and personnel regulations than an ordinary government employer." Nixon v. City of Houston, 511 F.3d 494, 498 (5th Cir. 2007) (citing Tindle v. Caudell, 56 F.3d 966, 971 (8th Cir. 1995)).  Ultimately, the government has the burden of proving that its interest outweighs the employee's interest.  U.S. Dep't of Justice v. FLRA, 955 F.2d 998, 1005 n. 7 (5th Cir. 1992) (en banc).

First, the Court considers the degree to which the activity related to a matter of public concern.  Jordan, 516 F.3d at 299.  "The more central a matter of public concern the speech at issue, the stronger the employer's showing of counter-balancing governmental interest must be." FLRA, 955 F.2d at 1006 (quoting Coughlin v. Lee, 946 F.2d 1152, 1157 (5th Cir. 1991)); see also Jordan, 516 F.3d at 299.  In this case, the Plaintiff publicly suggested that former Deputy Chief Robert Hall was targeted for investigation and demotion because of his race.

"There is perhaps no subset of matters of public concern more important than bringing official misconduct to light." Davis v. Ector County, 40 F.3d 777, 782 (5th Cir. 1994).[1]  Speech on such issues is particularly important when it involves the operation of a police department.  Kinney v. Weaver, 367 F.3d 337, 361 (5th Cir. 2004).  Therefore, the Plaintiff's speech concerned a matter of high public concern.

_____

[1]See also Kennedy v. Tangipahoa Parish Library Bd. of Control, 224 F.3d 359, 373 n. 16 (5th Cir. 2000) ("While no case in this Circuit specifically defines 'official misconduct' or 'wrongdoing,' the term clearly envelopes conduct exposing the state to mere civil liability.").

Next, the Court considers the time, place, and manner of the speech. Jordan, 516 F.3d at 299. Any legitimate public interest in the subject matter of the speech must be "tempered by considerations of whether [Plaintiff's] position in the workplace made [him] an informed and appropriate speaker and whether" the Plaintiff's concerns were communicated "at the appropriate time under the circumstances." Davis v. Allen Parish Serv. Dist., 210 Fed. Appx. 404, 413 (5th Cir. 2006). "[I]t is proper to consider the position of the speaker within the workplace and how the position relates to the speaker's familiarity with or access to information about the issues on which [he] speaks." Id. at 410. Also, if the position requires confidentiality, the public employee receives less First Amendment protection. Vojdovich v. Lopez, 48 F.3d 879, 885 (5th Cir. 1995) (noting that the government's interests more easily outweigh the public employee's interests if the public employee is in a confidential position); Gillespie v. City of Macon, 485 F. Supp. 2d 722, 728 (S.D. Miss. 2007) (noting that government employees in "confidential" positions receive less First Amendment protection than other employees).

Plaintiff was the internal affairs officer at the Department; thus, he was routinely privy to confidential information. However, he was not personally involved with the investigation of Robert Hall, other than being interviewed by MBI officers. Therefore, his speech did not constitute a threat to or breach of the confidentiality requirements of his position or Hall's investigation in particular. Although Plaintiff was not directly involved with the events that formed the basis of the suspension and demotion of Hall, he was in a position to know more than the average citizen, as he was an experienced police officer.

Further, Tupelo public officials testified that the purpose of the community meeting at which Plaintiff spoke was to give anyone in the city an opportunity to voice their concerns about several

issues, one of which was the operation of the police department. Those present at the meeting were polled, and law enforcement/police department discrimination was the second most cited concern. Therefore, given the purpose and context of the community meeting, it was generally an appropriate place for a speech like Plaintiff's to be made. However, Plaintiff did not attempt to express his concerns through official, confidential channels.

Next, the Court considers whether the speech at issue can be considered hostile, abusive, or insubordinate. Jordan, 516 F.3d at 299. Plaintiff's statement was in violation of the Department's General Order 90-4. Section 30 of the General Order states:

> Employees shall not address public gatherings, appear on radio or television, prepare any articles for publication, act as correspondents to a newspaper or a periodical, release or divulge investigative information, or any other matters without proper authority. Officers may lecture on "police" or other related subjects only with prior approval of the Chief of Police or the Deputy Chief.

Acts of insubordination - such as violations of departmental policy - weigh in favor of the government's interest in efficiency. Nixon, 511 F.3d at 499.

Finally, the Court considers the potential and actual impact of the speech on the operation of the Department, combining the third and fifth factors of the anlysis: whether close working relationships are essential to fulfilling the employee's public responsibilities and the potential effect of the employee's activity on those relationships; and whether the activity impairs discipline by superiors or impairs harmony among coworkers. See Jordan, 516 F.3d at 299. These two factors both implicate the broader concern of whether the speech activity actually or potentially disrupts the operation of the government employer. See Vojvodich, 48 F.3d at 885 (purpose of the factors is to facilitate balancing of speech interests against alleged disruption to the effective and efficient operation of the government employer's responsibilities). Prudent administrators are not forbidden

from taking action before a risk turns into an actual disruption. Kinney, 367 F.3d at 364. "[C]ourts have consistently given 'substantial weight to government employers' reasonable predictions of disruption." Nixon, 511 F.3d at 499 n. 8 (quoting Waters v. Churchill, 511 U.S. 661, 673, 114 S. Ct. 1878, 128 L. Ed. 2d 686 (1994)).

Defendant argues that the speech at issue caused public embarrassment to the Department. The reputation of a police department is a legitimate and substantial governmental concern, and damage to it "would undoubtedly impair the proper performance of [police department] functions." Nixon, 511 F.3d at 499 (citing City of San Diego v. Roe, 543 U.S. 77, 81, 125 S. Ct. 521, 160 L. Ed. 2d 410 (2004)). Defendant presented no evidence at trial as to the impact of the speech on the Department's reputation. However, the Department's prediction of damage to its reputation is reasonable given the severity of the allegations made by the Plaintiff. See City of San Diego, 543 U.S. at 81, 125 S. Ct. 521 (police department had a legitimate and substantial interest in preventing an officer from selling pornographic videos of himself on eBay, in which he was clearly identified as a law enforcement officer); Nixon, 511 F.3d at 500-01 (reasonable for a police department to believe that a police officer's newspaper columns and the caustic remarks therein would impair the proper performance of its functions).

Defendant also argues that Plaintiff's speech caused actual disruption to the operation of the Department. At trial, a few officers from the Department testified that Plaintiff's speech did not disrupt the morale of the Department. One of those officers testified that any morale problems within the Department preceded Plaintiff's speech. In contrast, other officers testified that they overheard comments around the Department expressing concern over the Plaintiff's speech and his ability to conduct impartial internal affairs investigations. However, none of the officers who

testified as to these overheard comments were able to name specific officers who held such concerns or relate specific conversations. Further, one of them admitted to having had a personal problem with Plaintiff relating to a previous internal affairs matter. None of the officer-witnesses were aware of any threats made against Plaintiff by members of the Department. And, although Plaintiff feared for his own safety at work, he admitted that he had not been threatened in any way.

Despite Chief Chaffin's testimony that Plaintiff's speech caused officers to worry about getting a fair evaluation of any complaints that may be made against them, the Chief could not name a specific officer who held such a concern. The Chief formed his belief that the Plaintiff's speech created problems in the Department based on reports from two of the majors under his command regarding comments overheard around the Department, similar to the testimony cited above.

The evidence at trial did not reveal any "unanticipated delays or disruption or interference with the . . . functioning of the police department" beyond vague testimony about overheard comments by unidentified officers. Branton, 272 F.3d at 741. However, the Court gives substantial weight to reasonable predictions of disruption. Nixon, 511 F.3d at 499 n. 8. The Chief testified that he was concerned that officers - based on the perception that the Plaintiff would prejudge any complaints filed against them - would alter their behavior in the field to a degree that it would adversely affect their performance. The Chief's concern is a reasonable one, and the Court gives it due consideration.

The Fifth Circuit Court of Appeals has noted that police departments are given more latitude in their disciplinary and personnel decisions because of the paramilitary nature of police departments. Nixon, 511 F.3d at 498. However, while Nixon is instructive as to the importance of the government's interest in efficiency and reputation, its usefulness in deciding the outcome of this

particular case is limited by the fact that the Plaintiff's speech was of substantially greater public concern than Nixon's speech was. The value of Nixon's speech was "somewhat diminished by the fact that a significant amount" of it was mere denigration of segments of the city's population. Nixon, 511 F.3d at 501. Plaintiff's speech, however, involved a matter of public concern that carries a very significant amount of weight: allegations of racial discrimination in the operation of a police department.

The public concern implicated by Plaintiff's speech outweighs the City's concern for potential disruption to the operation of the Department. The evidence presented at trial did not show any actual disruption to the operation of the Department, and the evidence supporting a concern for potential disruption was limited to vague testimony about overheard comments from unspecified officers. The exposure of official misconduct within a police department is of great consequence to the public. Branton, 272 F.3d at 740. There is "perhaps no subset of public concern more important." Id. at 734 (citation omitted). "[C]oncerns about maintaining harmony and eliminating disruption cannot be the sole measure of governmental interest when the employee's speech furthers other important state interests." Id. at 742. In this case, Plaintiff's comments served an important state interest, and his interest in speaking outweighs the City's interest in efficiency. Therefore, Defendant's Motion for Judgment as a Matter of Law on this basis is denied.

4.    *Recklessly False Speech*

Defendant also argues Plaintiff's speech is unprotected because it was recklessly false, citing Garrison v. Louisiana, 379 U.S. 64, 85 S. Ct. 209, 13 L. Ed. 2d 125 (1964). However, as noted above, a government employee's speech is protected by the First Amendment if it involves a matter of public concern and the employee's interest in speaking outweighs the government's interest in

efficiency.  City of San Diego, 543 U.S. at 82-83, 125 S. Ct. 521; Wallace v. County of Comal, 400

F.3d 284, 291 (5th Cir. 2005) (citing Waters, 511 U.S. at 668, 114 S. Ct. 1878).  The truth or falsity

of the speech is relevant to the interest-balancing analysis - but it is not determinative.  See Wallace,

400 F.3d at 290 (government employer may not rely on its interest in efficiency if plaintiff's

allegations of official misconduct are true); Warnock v. Pecos County, 116 F.3d 776, 781 (5th Cir.

1997); Zisman v. Mason, 2008 U.S. Dist. LEXIS 25739, *16-*17 (S.D. Miss. Mar. 30, 2008)

(conclusion that speaker's statement was made with reckless disregard for the truth was among

factors leading to district court's conclusion that defendants' interest in efficiency outweighed

plaintiff's interest in speech).  The Pickering balancing test requires particularized consideration of

the facts of each case, and the non-exclusive list of factors is a guide to determining the parties'

interests and the respective weight of those interests.  Davis, 210 Fed. Appx. at 411-12.  The inquiry

does not - as Defendants urge - boil down to a single issue.

Defendant contends Plaintiff's comments were recklessly false because Hall pled guilty to

misdemeanor charges stemming from his actions in the Shells incident.  The Court disagrees.  Hall's

entry of a guilty plea is unrelated to the truth or falsity of Plaintiff's allegation that race was a

motivating factor in how the City dealt with Hall in the aftermath of the Shells incident, particularly

in light of the testimony that officers routinely exercise their discretion as to whether to arrest a

suspect or release him pending further investigation.

Testimony as to two incidents occurring after Plaintiff's speech was offered at trial.  One

involved a suspected drunk driver that was allowed to call a cab to take him home.  The other

involved an assault on an officer in which the perpetrator was sent to a mental health facility, rather

than having criminal charges filed against him.  Criminal charges were not pursued against either

of the officers in those cases. More importantly, Hardy and Hall both testified that they could not recall another time in which an officer was criminally prosecuted for exercising his discretion as to whether to immediately arrest a suspect or to release him pending further investigation. While the Court expresses no opinion as to the truth or falsity of Plaintiff's speech or as to the wisdom of Robert Hall's actions on the night of the Shells incident, the Court can not categorize Plaintiff's speech as *recklessly* false given the above testimony.

   5.   *Causation*

"First Amendment retaliation claims are governed by the Mt. Healthy 'mixed-motives' framework." Gonzalez v. Dallas County, 249 F.3d 406, 412 n. 6 (5th Cir. 2001); Charles v. Grief, 522 F.3d 508, 516 n. 28 (5th Cir. 2008); see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977). Once an employee has met his burden of showing that his protected conduct was a substantial or motivating factor in the employer's adverse employment action, the burden shifts to the employer to show, by a preponderance of the evidence, that it would have taken the same adverse action even in the absence of the speech. Charles, 522 F.3d at 516 n. 28; Jordan, 516 F.3d at 301. If the employer makes this showing, then there is no constitutional violation. Charles, 522 F.3d at 516 n. 28. A plaintiff pursuing a First Amendment retaliation claim may rely upon a chronology of events from which retaliation may plausibly be inferred. Brady v. Houston Indep. Sch. Dist., 113 F.3d 1419, 1424 (5th Cir. 1997). However, the length of time between the speech and the adverse action is only probative of causation, not determinative. Jordan, 516 F.3d at 300-01.

The speech in the present case occurred on October 12, 2006. The Chief removed Plaintiff from his internal affairs responsibilities on November 7, 2006. At trial, the Chief testified that he

removed Plaintiff from his position as internal affairs officer because he believed that the speech would create problems in the Department, as officers would not believe they would receive fair internal affairs investigations. However, the Chief also testified that it was already his practice to not assign Plaintiff to all internal affairs investigations.

Plaintiff and at least one other officer testified that the Chief's stated reason for removing Plaintiff from internal affairs was because he had lost his objectivity. The same officer also testified that he had never witnessed anything to cause him to question Plaintiff's objectivity or fairness. A reasonable juror could conclude, based on the above facts, that Plaintiff's speech was a substantial or motivating factor in the Chief's decision to remove Plaintiff from his internal affairs duties, and that the Chief would not have made the decision but for the Plaintiff's speech.

The Chief removed Plaintiff from his public relations positions in March 2007, approximately five months after Plaintiff's speech at the community meeting. The Chief testified that he moved Plaintiff to the apartment patrol unit because of his prior experience as a liaison to the city's apartment managers. Another officer also testified that the Chief stated he was moving Plaintiff to the apartment patrol for that reason. There was also testimony that Plaintiff implemented his special training in the area of community-oriented policing by networking with the apartment managers in the city.

Plaintiff testified that the officer who would have been his partner at the apartment patrol had, on more than one occasion, performed his duties in a substandard manner. Further, Plaintiff held the rank of Captain, and there was testimony at trial that the apartment patrol positions were currently filled by patrol officers junior in rank and experience to the Plaintiff. It is undisputed that, had the Plaintiff not resigned, he would have lost his take-home car, his supervisory responsibilities,

and the benefit of wearing plain clothes rather than a uniform. Additionally, several witnesses testified that Plaintiff's performance in the various public relations positions he filled was without fault. Finally, Plaintiff testified as to his own belief that the transfer to the apartment patrol was a punitive measure in response to his speech.

"As the trier of fact, the jury had the exclusive authority to assess the credibility of witnesses." Brady, 145 F.3d at 714. The jury was free to discredit the Chief's testimony regarding his motivation for transferring the Plaintiff to the apartment patrol. Id. Direct evidence of a retaliatory motive is not necessary for the jury's verdict on this issue to be reasonable. Brady, 113 F.3d at 1424. In light of the above facts, a reasonable jury could believe that the Plaintiff's speech was a substantial or motivating factor in the decision to remove the Plaintiff from his public relations positions and transfer him to the apartment patrol, and that the Chief would not have so decided but for the Plaintiff's speech. Therefore, the Defendant's Motion for Judgment as a Matter of Law on this basis is denied.

*C.*      *Title VII*

To establish a prima facie case of retaliation under Title VII, a plaintiff must establish that "(1) he participated in an activity protected by Title VII; (2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse employment action." McCoy, 492 F.3d at 556-57. A plaintiff may prove these elements by either direct or circumstantial evidence. Id. at 556; McCullough v. Houston County, 297 Fed. Appx. 282, 288 (5th Cir. 2008).

Defendant argues that the Court must enter judgment as a matter of law in its favor as to Plaintiff's Title VII retaliation claim as 1) no adverse employment action took place; 2) Plaintiff's

speech is unprotected under Title VII; and 3) no causal connection exists between Plaintiff's speech and Defendant's reassignment of Plaintiff.

1.    *Adverse Employment Action*

Without an adverse employment action, a plaintiff can not make a prima facie case of retaliation under Title VII. McCoy, 492 F.3d at 557 (citing Fierros v. Tex. Dep't of Health, 274 F.3d 187 (5th Cir. 2001)).   Historically, the Fifth Circuit has held that "adverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." Id. at 559.   However, after Burlington Northern & Santa Fe Railway v. White, an adverse employment action, in the context of a Title VII retaliation claim, is defined as any action that "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. (citing Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)); see also Watkins v. Tex. Dep't of Crim. Justice, 269 Fed. Appx. 457, 461 (5th Cir. 2008).

Adverse employment actions must be viewed in the context of the particular case. McCoy, 493 F.3d at 560.  The fact that the action does not mean a reduction in payment does not necessarily mean there was no adverse employment action. Id. at 560-61.  "The loss of job responsibilities can in some circumstances constitute an adverse employment action." Browning v. Southwest Research Inst., 288 Fed. Appx. 170, 178 (5th Cir. 2008).

Plaintiff testified that his work as an internal affairs officer was very important to him because he viewed it as a way of making positive changes in the Department and cultivating public trust in the Department.   Similarly, the Chief described Plaintiff's public relations offices as significant positions.  Plaintiff also testified that he believed he would be in danger in the apartment

patrol position as it involved dangerous domestic violence calls, and he did not believe that he would receive support from other officers.

It is undisputed that Plaintiff was not required to wear a uniform before he was reassigned to the apartment patrol. Moreover, he had supervisory responsibilities and a take-home car. However, after reassignment, he would have been required to wear a uniform, and he would have lost his take-home car and supervisory responsibilities. More than one witness testified that the apartment patrol was currently assigned to officers lower in rank than Plaintiff would be if he were still employed with the Department. Plaintiff would have also been required to answer to the shift commander, who might hold a lower rank than Plaintiff held.

In light of the above facts, a reasonable juror could find that the Department's removal of the Plaintiff from internal affairs and subsequent reassignment to the apartment patrol unit could dissuade a reasonable worker from making or supporting a charge of discrimination. The Department's actions could have carried "both the stigma of the suspicion of wrongdoing and possibly significant emotional distress," in light of the high value Plaintiff ascribed to his internal affairs and public relations duties and the loss of benefits he would have undergone had he accepted the transfer. McCoy, 492 F.3d at 561. Also, in light of the testimony that officers lower in rank than the Plaintiff currently fill the apartment patrol position, it would not be unreasonable for a jury to conclude that the transfer could have negatively affected Plaintiff's chances for future advancement. Id. The Defendant's Motion for Judgment as a Matter of Law on this basis is denied.

2. *Protected Under Title VII*

In a case arising under the opposition clause of Title VII, a plaintiff must only show that he had an objectively "reasonable belief that the employer was engaged in unlawful employment

practices" in order to establish that he was engaged in a protected activity. Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337, 348 (5th Cir. 2007) (citing Byers v. Dallas Morning News, 209 F.3d 419, 428 (5th Cir. 2000)); Parker v. State of La. Dep't of Educ.Special Sch. Dist., 323 Fed. Appx. 321, 329 (5th Cir. 2009); Allen v. Admin. Review Bd., 514 F.3d 468, 477 (5th Cir. 2008). The Fifth Circuit has stated, "[i]f '[r]easonable minds could disagree on the issue,' the objective reasonableness of an employee's belief should not be decided as a matter of law, and the fact-finder's resolution of the issue is entitled to deference on appeal." Allen, 514 F.3d at 477 (citing Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1188 (11th Cir. 2001)).

The jury was instructed on this issue, and they returned a verdict in favor of Plaintiff. Sufficient evidence was presented such that reasonable minds could differ as to whether Plaintiff had a reasonable belief that the Department's decisions with regard to the Robert Hall matter were motivated by race. Plaintiff testified that the facts recorded in the incident report did not indicate any wrongdoing by Hall, in that officers routinely exercised their own discretion when deciding whether to immediately arrest a suspect or to release him pending further investigation. In addition to the Plaintiff's testimony, other witnesses testified that officers routinely exercised their own discretion when deciding whether to arrest a suspect or to release him. Robert Hall testified that he did not believe he did anything wrong in the way he handled the Shells matter. Hall also testified that criminal charges were not brought against him until after he filed a grievance over his demotion.

A member of the Tupelo City Council testified that prior to Plaintiff's speech she had received complaints alleging that Robert Hall was being treated improperly, and she felt that Plaintiff's speech substantiated those complaints.

In light of the above evidence, reasonable minds could differ on whether Plaintiff's belief

that the City was engaged in an unlawful employment practice was reasonable. Therefore, Defendant's Motion for Judgment as a Matter of Law on this issue is denied.

 *3.*   *Causation*

To establish a prima facie case of retaliation, a plaintiff must prove "a causal connection exists between the protected activity and the adverse employment action." McCoy, 492 F.3d at 556-57. The post-trial question before the Court is whether there was legally sufficient evidence to support the jury's verdict. Adams, 475 F.3d at 691 (citing Bryant v. Compass Group USA Inc., 413 F.3d 471, 476 (5th Cir. 2005), *cert. denied*, 546 U.S. 1090, 126 S. Ct. 1027, 163 L. Ed. 2d 855 (2006)); Campbell v. England, 234 Fed. Appx. 183, 185 (5th Cir. 2007).

For the same reasons stated in the Court's discussion of the causation element of the Plaintiff's First Amendment retaliation claim, the Court finds that sufficient evidence was presented at trial to support a reasonable jury's conclusion that Plaintiff's opposition activity caused the adverse employment action. Therefore, Defendant's Motion for Judgment as a Matter of Law on this basis is denied.

**D.**   **Constructive Discharge**

Defendant argues that Plaintiff failed to establish that he was constructively discharged. Constructive discharge is considered a tangible employment action. Donaldson v. CDB, Inc., 2009 U.S. App. LEXIS 15269, *16 (5th Cir. July 6, 2009) (citing Wyatt v. Hunt Plywood Co., Inc., 297 F.3d 405, 410 n. 15 (5th Cir. 2002)). "To establish constructive discharge, a plaintiff must show the 'working conditions were so intolerable that a reasonable employee would feel compelled to

resign.'" Id. (quoting Lauderdale v. Tex. Dep't of Crim. Justice, 512 F.3d 157, 167 (5th Cir. 2007)).[2]

Factors in concluding whether a plaintiff has been constructively discharged include:

(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer, calculated to encourage the employer's resignation; (7) offers of early retirement [or continued employment on terms less favorable than the employee's former status].

Donaldson, 2009 U.S. App. LEXIS 15269 at *16.

Plaintiff's removal from internal affairs and subsequent reassignment to the apartment patrol unit did not entail a reduction in rank or salary. However, after reassignment, he would have no longer been responsible for the variety of public relations positions in which he had worked for some time - positions in which his performance had no fault, according to several witnesses. Further, Plaintiff held the rank of Captain, and there was testimony at trial that the apartment patrol positions were currently filled by patrol officers junior in rank and experience to Plaintiff. Plaintiff also testified that he would have had to answer to the shift commander, an officer potentially lower in rank and experience than he was. It is undisputed that, had Plaintiff not resigned, he would have lost his take-home car, his supervisory responsibilities, and the benefit of wearing plain clothes rather than a uniform. Plaintiff also testified that he feared he would not receive the support of his fellow officers in responding to dangerous calls, but several officers denied that any threats had been made

---

[2]The same constructive discharge analysis applies in retaliation cases under the First Amendment and retaliation cases under Title VII. See Cavazos v. Edgewood Indep. Sch. Dist., 210 Fed. Appx. 414, 415 (5th Cir. 2006) ("To prove constructive discharge, [plaintiff] must show that 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'") (quoting Landgraf v. USI Film Prods., 968 F.2d 427, 429-30 (5th Cir. 1992)); Epperson v. City of Shreveport, 85 Fed. Appx. 364, 365 (5th Cir. 2003) (citing Brown v. Kinney Shoe Corp., 237 F.3d 556, 566 (5th Cir. 2001)).

against Plaintiff.

Plaintiff's wife testified that, although he mentioned early retirement after he was transferred to the apartment patrol, he did not want to retire. She stated, "He was still trying to stay in the Department, and he didn't want to take early retirement." She elaborated: "He told me he was worried where he was going to be assigned and what all was going on. So, he was scared to go... work there, that anybody would back him up if he needed help."

In light of the above evidence, a reasonable jury could conclude that a reasonable employee in the Plaintiff's shoes would have felt compelled to resign. Therefore, Defendant's Motion for Judgment as a Matter of Law on this issue is denied.

### III. New Trial

Alternatively, Defendant moves for a new trial. Rule 59 of the Federal Rules of Civil Procedure states that "[t]he court may, on motion, grant a new trial on all or some of the issues... after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A). This Court has observed:

> A new trial may be granted, for example, if the district court finds that the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in the course of the trial.

Torns, 2008 U.S. Dist. LEXIS 69023 at *5 (citing Eyre v. McDonough Power Equip., Inc., 755 F.2d 416, 420-21 (5th Cir. 1985); Westbrook v. Gen. Tire & Rubber Co., 754 F.2d 1233, 1241 (5th Cir. 1985); Carson v. Polley, 689 F.2d 562, 570-71 (5th Cir. 1982); Martinez v. Food City, Inc., 658 F.2d 369, 372-74 (5th Cir. 1981); Conway v. Chem. Leaman Tank Lines Inc., 610 F.2d 360, 363 (5th Cir. 1980)). "In granting a new trial, the district court weighs all of the evidence, and it need not view it in the light most favorable to the nonmoving party." Laxton v. Gap Inc., 333 F.3d 572, 586 (5th

Cir. 2003). "A new trial is warranted if the evidence is against the great, and not merely the greater, weight of the evidence." Id.

Defendant offers two arguments in support of its Motion for a New Trial. First, Defendant argues that the Court erred in admitting evidence as to other race issues and other discretionary decisions by officers. Second, Defendant argues that the Court erred in not instructing the jury as to the interest-balancing portions of First Amendment and Title VII retaliation claims.

## A.    *Evidence of Other Race Issues*

First, Defendant argues that the Court erred in admitting evidence of other alleged racial issues and other discretionary decisions by officers. Specifically, Defendant alleges that the Court erred by allowing evidence of the following: 1) an alleged beating of a suspect on or about November 25, 2006; 2) a discretionary decision by an African-American officer to call a cab for a state department employee who was driving under the influence on or about January 1, 2009; 3) an incident involving Officer Lee Miller in which a police dog was put on a suspect in handcuffs for which Miller was disciplined; 4) an incident in which a suspect who assaulted an officer was not arrested, but, rather, taken to a behavioral health center; and 5) inappropriate pictures on the wall of an officer in the department. When asserted prejudice is the basis of a motion for a new trial, "[c]ourts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking new trial." Sibley v. Lemaire, 184 F.3d 481, 487 (5th Cir. 1999) (quoting Del Rio Distributing, Inc. v. Adolph Coors Co., 589 F.2d 176, 179 n. 3 (5th Cir. 1979)); see also Bridges v. Enter. Prods. Co., 551 F. Supp. 2d 549, 553-54 (S.D. Miss. 2008).

Evidence as to the objective reasonableness of Plaintiff's "belief that the [Department] was

engaged in unlawful employment practices" was relevant to the Plaintiff's Title VII claim. Turner, 476 F.3d at 348 (to establish that his opposition activity was protected, plaintiff must show that his belief that employer was engaged in unlawful employment activity was reasonable); see also Parker, 323 Fed. Appx. at 329; Allen, 514 F.3d at 477. Moreover, evidence as to the truth or falsity of Plaintiff's speech was relevant to the First Amendment claim's interest-balancing analysis. See Wallace, 400 F.3d at 290 (government employer may not rely on its interest in efficiency if plaintiff's allegations of official misconduct are true); Warnock, 116 F.3d at 781; Zisman, 2008 U.S. Dist. LEXIS 25739 at *16-*17.

The speech at issue alleged that the Department handled the Hall matter differently than it would have if Hall had not been an African-American officer. The speech was given at a community meeting for the discussion of racial reconciliation in the Tupelo community. Plaintiff testified that the basis of his belief that Hall was being persecuted because of race was his comparison of how the Department typically handled officers' exercises of discretionary authority to the manner in which the Hall matter was being pursued, his knowledge of Hall's relationships with other officers in the Department, and his knowledge of the "uproar in the community" over the Hall matter. Therefore, evidence of other allegations of race-based misconduct or racial division within the Department was relevant to the determination of the reasonableness of Plaintiff's belief that the Department was engaged in an employment practice unlawful under Title VII.

Defendant had the opportunity to present witnesses to explain the alleged differences between the Hall matter and the matters involving white officers' exercises of discretion. Defendant also had opportunities on cross-examination to draw out the facts it believed made other examples of discretionary authority or alleged racial discrimination dissimilar to the Hall matter. Chief

Chaffin touched on this issue briefly in his testimony and expressed his belief that the Hall matter was a distinctly different situation than the other examples of officer discretion raised by Plaintiff's counsel during cross-examination. However, the Chief did not elaborate. He merely made a conclusory statement that the examples were dissimilar and stated that every exercise of discretion has to be evaluated on a case-by-case basis.

With respect to the specific testimony to which Defendant objects, the Court first notes that the evidence concerning the alleged beating of a suspect was relevant to the issue of how the Department typically handles complaints against officers and discipline of officers. The testimony of the alleged beating was brief. In fact, Defendant's witnesses denied that the Department had anything to do with the incident, and Plaintiff offered no evidence to the contrary. Therefore, the Court does not believe that the testimony was overly prejudicial or that it tainted the proceedings to a degree that a new trial is merited.

Second, with respect to the state department employee who was driving under the influence, despite Defendant's assertion to the contrary in its briefing, there was no evidence at trial that the officer who stopped the suspected drunk driver was an African-American officer. The brief testimony on the subject was relevant to the issue of the Department's policy with respect to the discretionary release of suspected drunk drivers. Likewise, the testimony about a suspect being released to a mental rehabilitation center after assaulting an officer was also relevant to the determination of the contours of the Department's policy regarding discretionary release of suspects.

The testimony that Officer Lee Miller had previously put a police dog on a suspect in handcuffs came in during Hall's testimony. Hall testified that when he was told Miller was the arresting officer in the Shells matter, he became concerned because of Miller's past disciplinary

issues.  Therefore, the brief testimony that Miller had previously been disciplined for putting a dog on a suspect in handcuffs was relevant to Hall's motivation throughout the incident in question and, therefore, ultimately relevant to the issues of whether Plaintiff had a reasonable belief that the Department was engaged in an unlawful employment activity and whether the allegations of Plaintiff's speech were substantively true or false.

Finally, the evidence regarding racially inappropriate pictures in the office of an officer (specifically, a portrait of Nathan Bedford Forrest) was relevant to the reasonableness of Plaintiff's belief that the Department was engaged in an unlawful employment practice.  Further, Defendant did not object to the admission of that testimony at trial.

In support of their Motion for a New Trial, Defendant cites Wyvill v. United Companies Life Insurance Co., 212 F.3d 296 (5th Cir. 2000), in which the Fifth Circuit vacated a plaintiff's judgment on the basis that the trial court admitted anecdotal evidence of other acts of age discrimination to support a claim that the defendant engaged in a pattern or practice of age discrimination in violation of the Age Discrimination in Employment Act.  212 F.3d 296, 302 (5th Cir. 2000).  The key difference between Wyvill and the case *sub judice* is that Wyvill involved an age discrimination claim under the ADEA - not a First Amendment or Title VII retaliation claim.  Wyvill, 212 F.3d at 298.  First Amendment retaliation claims by government employees require the Court to balance the interests of one party against the other within the context of the particular case.  Davis, 210 Fed. Appx. at 411-12.  Title VII retaliation claims arising under the opposition clause require the jury to determine whether the plaintiff had a reasonable belief that the employer was engaged in an unlawful employment practice.  Turner, 476 F.3d at 348.  Both of these inquiries require evidence of other exercises of officer discretion to which the Court may compare Hall's.

Defendant also cites Goff v. Continental Oil Company, 678 F.2d 593 (5th Cir. 1982), *overruled on separate grounds*, 912 F.2d 832 (5th Cir. 1990). Goff involved an individualized race discrimination claim under Title VII, rather than a retaliation claim arising under the opposition clause of Title VII. Id. at 595. Therefore, the reasonableness of the employee's belief that his employer was engaged in an unlawful employment activity was not at issue in Goff.

Plaintiff publicly suggested that the Department would not have treated Hall in the manner it did were it not for his race. The Court knows of no other way to evaluate the reasonableness, truth, or falsity of such an allegation without an examination of how the Department has handled situations in which white officers have exercised discretion in factually similar situations. Defendant had the opportunity to present witnesses to explain the alleged dissimilarity between the Hall matter and the matters involving exercise of discretion by white officers. Defendant had opportunities on cross-examination to draw out facts it believed created said dissimilarity. Furthermore, Defendant was free to request a limiting instruction as to any testimony it found objectionable, but did not.

In light of the above considerations, the Court holds that Defendant has not met its burden of proving that prejudicial error has crept into the record or that substantial justice was not done in the trial of this matter. Defendant's Motion for New Trial on this basis is denied.

**B.      *Jury Instruction as to Balancing***

Defendant argues that it is entitled to a new trial because the Court erred by not giving sections of their submitted jury instructions related to interest-balancing in the context of First Amendment and Title VII retaliation claims.

First, Defendant argues that the Court erred by not including the interest-balancing language

of the Fifth Circuit's pattern jury instruction on First Amendment retaliation claims. The instruction submitted by the Defendant included the following language, which the Court denied:

> Plaintiff as a public employee has a right to practice freedom of speech only to the extent that it does not unduly interfere with the duties and responsibilities of Plaintiff's employment. In determining whether the Plaintiff's speech activities in this case were protected activities under the First Amendment, you must balance the Plaintiff's First Amendment interest against the Defendant's interest in maintaining and effectively operating police department, not only for the citizens of the community, but for all officers in the department.

However, "[i]t is for the Court to determine the importance of a plaintiff's speech interest, to determine the importance of a governmental interest in efficient operations, and to balance the relative weight of each." Kinney, 367 F.3d at 363; see also Cooley v. Grimm, 272 Fed. Appx. 386, 390 n. 5 (5th Cir. 2008) ("The district court, not the jury, must perform the *Pickering* balancing."); Davis, 210 Fed. Appx. at 408 ("The *Pickering* balancing inquiry is also a question of law."); Cmty. Workers of Am. v. Ector County Hosp. Dist., 392 F.3d 733, 738 (5th Cir. 2004) (balancing test is legal in nature and for the court to resolve); Branton, 272 F.3d at 739. Therefore, the instruction submitted by Defendant was an inaccurate statement of the law, to the extent that it instructed the jury to balance Plaintiff's interests against those of the Defendant. Further, failure to instruct the jury on a legal doctrine that is not relevant to a determination properly before them can not have impaired Defendant's ability to effectively present its defense on that issue.

Defendant also argues that the Court erred by not instructing the jury to balance Plaintiff's interest in protesting perceived racial discrimination under Title VII against the Defendant's interest in operating the Department as it believed best. Defendant's submitted instruction included the following language, which the Court denied: "If you find that Plaintiff's comments here were not reasonable under the circumstances and that his comments were unduly disruptive to the effective

operation of the police department, [then] his comments are not protected by Title VII and you should find in favor of Defendant."

In a case arising under the opposition clause of Title VII, a plaintiff must only show that he had an objectively "reasonable belief that the employer was engaged in unlawful employment practices" in order to establish that he was engaged in a protected activity. Turner, 476 F.3d at 348; Parker, 323 Fed. Appx. at 329; Allen, 514 F.3d at 477. The instruction given to the jury stated:

> . . . Plaintiff must establish that he had a good-faith, reasonable belief that Robert Hall was being persecuted because of his race. Plaintiff's burden under this standard has both a subjective and objective component. A Plaintiff must not only show that he subjectively believed that the Tupelo Police Department was engaged in unlawful employment practices, but also the belief was objectively reasonable in light of all the facts in the record. If Plaintiff fails to establish that he had a reasonable belief for the comments that he made, the comments are not protected by Title VII and you must find in favor of Defendant.

Therefore, the instruction given to the jury was an accurate statement of the law, as it relates to Defendant's objection.[3]

The Court has the responsibility of fully and correctly instructing the jury on the applicable law of each case. Torns, 2008 U.S. Dist. LEXIS 69023 at *7 (citing Banc One Capital Partners Corp. v. Kneipper, 67 F.3d 1187 (5th Cir. 1995)). The Court is entitled to "considerable latitude in fashioning jury instructions so long as the charge taken as a whole is accurate and not misleading." Id. at *7. For the reasons stated above, the instructions which form the basis of Defendant's Motion

---

[3]The Court must note that it erred in allowing the language as to Plaintiff's burden to show a "subjective and objective component" to remain in the instruction. The Fifth Circuit Court of Appeals has "declined to address whether the 'reasonable belief' element of a Title VII retaliation claim includes both a subjective and objective component." Allen, 514 F.3d at 477 n. 4 (citing Payne v. McLemore's Wholesale & Retail Stores, 654 F.2d 1130, 1140 n. 11 (5th Cir. 1981)). However, the error - which placed a higher burden on Plaintiff - obviously did not prejudice Plaintiff's case. The Court notes the error merely for purposes of clarifying the issue for future proceedings.

for a New Trial were accurate statements of the relevant law.  As such, Defendant's Motion for a New Trial on this basis is denied.

### IV. Remittitur

The jury awarded Plaintiff $100,000.00 in lost wages and $200,000.00 in emotional distress damages.  Defendant argues that the back pay damages should be reduced to $47,500.00 and that the emotional distress damages should be reduced to $95,000.00.

*A.*      *Back Pay Damages*

The Fifth Circuit Court of Appeals has noted that courts in this jurisdiction are to defer to the jury's decision as to damages and remit damages "only to the maximum amount the jury could have awarded." Thomas v. Tex. Dep't of Crim. Justice, 297 F.3d 361, 368 (5th Cir. 2002).  " 'Back pay' commonly refers to the wages and other benefits that an employee would have earned if the unlawful event that affected the employee's job related compensation had not occurred." Rutherford v. Harris County, 197 F.3d 173, 191 (5th Cir. 1999).  Back pay is to be calculated from the time the adverse employment action takes place to the date of judgment. Id. (citing Edwards v. Occidental Chem. Corp., 892 F.2d 1442, 1449 (9th Cir. 1990)).  However, the amount of income Plaintiff would have earned in the Department had he not resigned should be reduced by his interim earnings since resignation. Stephens v. C.I.T. Group/Equip. Fin., Inc., 955 F.2d 1023, 1028 (5th Cir. 1992); Harkless v. Sweeny Indep. Sch. Dist., 427 F.2d 319, 324 (5th Cir. 1970); United States v. Mississippi, 725 F. Supp. 307, 316-17 (N.D. Miss. 1989) (citing McLaurin v. Columbia Mun. Separate Sch. Dist., 478 F.2d 348, 354 (5th Cir. 1973)).

The jury awarded Plaintiff $100,000.00 in back pay damages.  Defendant argues that the award should be remitted to $47,500.00, reduced by the retirement benefits that the Plaintiff has

received and the other income he has earned since his resignation. The Court must examine the evidence from trial and determine the maximum amount the jury could have awarded. Denton v. Morgan, 136 F.3d 1038, 1046-47 (5th Cir. 1998).

According to Plaintiff's state income tax return, he made $40,288.00 in 2006 as a Tupelo police officer. Plaintiff resigned on May 1, 2007, and the jury returned a verdict on July 24, 2009. Therefore, using the figure from Plaintiff's 2006 tax return as his annual income, the maximum amount of back pay that could accrue from the date of Plaintiff's resignation to the date of the jury's verdict, before any offsetting figures, is $89,958.14.[4] The tax records admitted at trial also show that Plaintiff made $4,542.50 in 2008. Therefore, the back pay awarded by the jury should be reduced to at least $85,415.64.[5]

Defendant argues that Plaintiff's back pay award should also be reduced by the distributions he has received from the Public Employees Retirement System. The Fifth Circuit Court of Appeals has held in ADEA discrimination cases that back pay awards should be reduced by payments received from an employer's retirement fund. See Guthrie v. J.C. Penney Co., Inc., 803 F.2d 202, 210 (5th Cir. 1986); Smith v. The Office of Personnel Mgt., 778 F.2d 258, 263 (5th Cir. 1985). The Court's reasoning in both of the above-cited cases focused on the collateral source rule. Guthrie, 803 F.2d at 210; Smith, 778 F.2d at 263. According to the collateral source rule, defendants may not benefit from payments made to a plaintiff by third parties. Guthrie, 803 F.2d at 209. However, the collateral source rule does not apply when the collateral source is the defendant. Smith, 778 F.2d at 263. Applying that rationale and looking at the practice of other jurisdictions, the Fifth Circuit

---

[4](2 years)($40,288.00) + (85 days / 365 days)($40,288.00) = $89,958.14

[5]$89,958.14 - $4,542.50 = $85,415.64

has ruled that back pay awards should be reduced by payments received from an employer's retirement fund.  Id.; Guthrie, 803 F.2d at 210.

In contrast, the Fifth Circuit has also held that "[a]pplication of the collateral source rule depends less upon the source of funds than upon the character of the benefits received."  Haughton v. Blackships, Inc., 462 F.2d 788, 790 (5th Cir. 1972).  "The mere fact that the employer-tortfeasor has contributed money (by payment of premiums, contributions, etc.) to the fund from which the benefits derive does not establish that such fund may not be a collateral source."  Id. (citing Hall v. Minn. Transfer Ry. Co., 322 F. Supp. 92, 95 (D. Minn. 1971)).  The Court elaborated:

> The policy considerations for the collateral source rule are apparent.  On the one hand, an employer-tortfeasor who voluntarily undertakes to indemnify itself against liability by payment into a fund for that purpose, should not be penalized by permitting the plaintiff a double recovery of his benefits under the fund as well as his full measure of damages.  On the other hand, where the employer-tortfeasor makes payment directly or indirectly into a fund established for an independent reason, or where such payment by the employer should be considered in the nature of a fringe benefit or deferred compensation, the employer should not be entitled to benefit by setting off such income in mitigation of his responsibility as a tortfeasor.

Id. at 791 (citing Jennings v. United States, 291 F.2d 880, 887-88 (4th Cir. 1961); United States v. Gallops, 207 F.2d 48, 50 (5th Cir. 1963)).

In Lubke, the Fifth Circuit struck a middle ground between the above-cited applications of the collateral source rule.  Lubke v. City of Arlington, 455 F.3d 489 (5th Cir. 2006).  Lubke involved claims under the Family and Medical Leave Act (FMLA) by a firefighter against the city which employed him.  Id.  The city argued that the district court should have offset the amount of the firefighter's retirement plan payout, which he received at termination, against his damage award.  Id. at 499.  The Fifth Circuit noted that in ADEA cases, it had consistently held that "[a]n employer's portion of retirement and other payments made to a terminated employee must be

deducted from an award of lost wages and benefits." Id. (citing Brunnemann v. Terra Int'l, Inc., 975 F.2d 175, 179 n. 7 (5th Cir. 1992); Guthrie, 803 F.2d at 209-10). However, the district court had applied the rationale of Haughton, characterizing the retirement payout as a form of fringe benefit or deferred compensation. Id. at 500 (citing Haughton, 462 F.2d at 788). The Fifth Circuit noted that where the city is being sued as an employer, rather than as a personal injury tortfeasor, the ADEA discrimination cases were more analogous. Id. However, the Court concluded that while the plaintiff should "not be penalized for his contributions" to the retirement fund, "the City should receive the benefit of . . . relevant precedent." Id. Therefore, the Court held that an offset should be allowed for the portion of the retirement plan payout contributed by the employer. Id.

The Court will follow the Fifth Circuit's analysis from Lubke and offset the back pay damages awarded to Plaintiff in an amount equal to the portion of retirement funds Plaintiff received during the relevant time period that are attributable to contributions by Defendant. The record from trial shows that Plaintiff received $13,968.08 in distributions from the Public Employees Retirement System in 2007, and $21,580.68 in distributions in 2008. Plaintiff also testified that he draws $1,638.00 in retirement each month. However, the record does not contain sufficient information for the Court to determine the exact amount of retirement benefits attributable to contributions by Defendant. The parties shall prepare briefs on this issue supported by proper documentation and submit them to the Court within fifteen (15) days of the entry of the Order accompanying this opinion.

The parties shall also brief this issue as it applies to Plaintiff's pending Motion for Back Pay through the date of final judgment and Motion for Front Pay [116]. Specifically, to what extent, if any, should any award of back pay through the date of final judgment be reduced, in light of the

Court's holding above, if the Court grants Plaintiff's Motion for Back Pay through the date of final judgment? Further, to what extent, if any, should any award of front pay be reduced, in light of the Court's holding above, if the Court grants Plaintiff's Motion for Front Pay?

For the reasons stated above, the jury's back pay award shall be remitted to $85,415.64, less the retirement funds Plaintiff has received that are attributable to contributions by Defendant. Plaintiff may accept the remittitur, or submit to a new trial on the issue of damages. Smith v. Harrah's New Orleans Mgt. Co., 213 Fed. Appx. 353, 362 (5th Cir. 2007); Campbell v. City of Jackson, Miss., 2005 U.S. App. LEXIS 7047, *4 (5th Cir. Apr. 21, 2005); Lee v. Edwards, 101 F.3d 805, 808 (5th Cir. 1996). Once the Court has considered the parties' briefs and determined the amount of retirement benefits contributed by Defendant, it will make a more specific determination as to remittitur of the jury's back pay award and address Plaintiff's pending Motion for Back Pay through the date of final judgment and Motion for Front Pay [116].

**B.      *Emotional Distress Damages***

Defendant argues that the jury clearly intended to award Plaintiff an amount of emotional distress damages twice the amount of actual damages. Therefore, since Defendant argues that the back pay should be remitted to $47,500.00, Defendant reasons that the emotional distress award should be remitted to $95,000.00.

To prove emotional distress, a plaintiff must first show a "specific discernable injury to the claimant's emotional state, proven with evidence regarding the nature and extent of the harm." Giles v. Gen. Elec. Co., 245 F.3d 474, 488 (5th Cir. 2001). Mere "[h]urt feelings, anger and frustration are part of life," and they are "not the types of harm that could support a mental anguish award." Id. However, "[d]amages for emotional distress may be appropriate . . . where 'the plaintiff suffers

sleeplessness, anxiety, stress, marital problems, and humiliation.' " Id. (quoting Migis v. Pearle Vision, Inc., 135 F.3d 1041, 1047 (5th Cir. 1998)); see also DeCorte v. Jordan, 497 F.3d 433, 442 (5th Cir. 2007) (emotional harm may also manifest itself as depression, emotional distress, loss of self esteem, excessive fatigue, nervous breakdown, ulcers, gastrointestinal disorders, hair loss or headaches). Plaintiff must offer "more than vague allegations to establish the existence of the injury." Giles, 245 F.3d at 488. "[T]o merit any award greater than nominal damages, emotional distress damages must 'be supported by competent evidence concerning the injury.' " Tureaud v. Grambling State Univ., 294 Fed. Appx. 909, 916 (5th Cir. 2008) (quoting Giles, 245 F.3d at 488). In some cases, "plaintiff's testimony alone may be sufficient proof of mental damages." Id.

Plaintiff testified that he felt his life was being threatened. He believed that the Department was trying to force him out or have him prosecuted in the same manner in which Hall had been prosecuted. Plaintiff further stated, "I felt like I was going crazy. I couldn't believe that my world had turned to the way it was." Plaintiff testified that he became depressed as being a police officer was very important to him.

Plaintiff's wife testified that Plaintiff's behavior changed after he was removed from internal affairs. She stated, "There was depression, and there was fear... I could tell he was really upset and everything was really making him nervous and stuff." She further testified that Plaintiff was worried about where he would be assigned and whether any other officers would back him up in the field.

Dr. Priscilla Roth-Wall, a clinical psychologist, testified that she had performed psychological testing on Plaintiff and prepared an evaluation based on the results. She testified that Plaintiff felt degraded, ostracized, harassed, and humiliated. She said that Plaintiff was afraid of other police officers, and that he believed he had no choice but to retire or be killed. She testified

that he even alerted his family to the possibility of danger. She further stated that after examination and testing, Plaintiff scored in the severe depression range on the Beck Depression Inventory and in the acute anxiety range on the Beck Anxiety Inventory. In her professional opinion, Plaintiff exhibited many symptoms of depression and acute stress. She did not testify, however, that Plaintiff had exhibited any physical symptoms of the alleged emotional damage. In fact, she specifically testified that she believed physical symptoms could result from continued stress.

The Court must "review with deference damage awards based on intangible harm, because the harm is subjective and evaluating depends considerably on the demeanor of witnesses." Tureaud, 294 Fed. Appx. at 916; see also Giles, 245 F.3d at 488 ("There is a strong presumption in favor of affirming a jury award of damages."). The Court may grant a remittitur if the defendant has made a "clear showing of excessiveness." Giles, 245 F.3d at 488; see also Eiland v. Westinghouse Elec. Corp., 58 F.3d 176, 183 (5th Cir. 1995) (emotional distress damages award may only be overturned upon clear showing of excessiveness or that the jury was influenced by passion or prejudice).

To decide whether a remittitur is in order, the Court applies the "maximum recovery rule." Parker Drilling Offshore United States LLC v. Campbell, 323 Fed. Appx. 330, 333 (5th Cir. 2009); see also Giles, 245 F.3d at 489 (citing Dixon v. Int'l Harvester Co., 754 F.2d 573, 590 (5th Cir. 1985)). The "maximum recovery rule" provides that the Court must "decline to reduce damages where the amount awarded is not disproportionate to at least one factually similar case from the relevant jurisdiction." Parker Drilling, 323 Fed. Appx. at 333 (citing Douglass v. Delta Air Lines, Inc. 897 F.2d 1336, 1344 (5th Cir. 1990)). However, "[b]ecause the facts of each case are different, prior damages awards are not always controlling; a departure from prior awards is merited if unique

facts are present that are not reflected within the controlling caselaw." Lejeune v. Transocean Offshore Deepwater Drilling, Inc., 247 Fed. Appx. 572, 575 (5th Cir. 2007). If the Court does reduce the damages, it applies a multiplier, or percentage enhancement, to ensure that it is not substituting its judgment for that of the jury's. Thomas, 297 F.3d at 369 (court used a multiplier of an additional 50%).

In a recent case involving a Title VII retaliation claim, the Fifth Circuit Court of Appeals approved an award of $140,000.00 in compensatory damages based solely on a plaintiff's own testimony. Tureaud, 294 Fed. Appx. at 916. In Tureaud, the plaintiff, a law enforcement officer, testified that his termination was "emotionally embarrassing" and "painful." Id. He further testified that he was "deeply hurt" because 1) he had never been terminated before; 2) his termination was the subject of gossip among a close-knit law enforcement community; 3) he was repeatedly questioned about the termination by peers and subsequent employers; and 4) he was unable to find suitable employment after termination. Id. Additionally, the plaintiff testified that he had gained weight, experienced stress, and "had the blues." Id. The Court affirmed the jury's award, stating that $140,000.00, while not clearly excessive, was "at the high end of the spectrum." Id.

In the current case, Plaintiff's testimony as to depression and fear was corroborated by his wife and an expert witness.[6] Further, the expert witness - a clinical psychologist - provided greater detail than Plaintiff did in his own testimony and provided a clinical assessment of Plaintiff's emotional injuries. This case was tried by a competent, literate jury who listened attentively for five

---

[6]Corroboration and expert testimony lend noteworthy support to a plaintiff's emotional damages claims. Thomas, 297 F.3d at 368. However, corroboration by a spouse may receive less consideration than corroboration by other parties. Salinas v. O'Neill, 286 F.3d 827, 832 (5th Cir. 2002) ("We are careful when upholding emotional damage awards supported only by testimony of the plaintiff and a spouse.").

days of testimony. This Court can not hold, based on the evidence, that the jury's emotional

damages award was "clearly excessive." A reasonable juror could find, based upon the testimony

of Plaintiff, his spouse, and a clinical psychologist, that Plaintiff had suffered mental anxiety, stress,

and depression. In light of the evidence and the Fifth Circuit's affirmation of a $140,000.00

emotional distress award in Tureaud - a case where the only evidence of emotional distress was the

plaintiff's own testimony - the Court finds that the jury's award of $200,000.00 in the case *sub*

*judice* is not clearly excessive. Therefore, Defendant's Motion for Remittitur is denied with respect

to the emotional damages award.[7]

---

[7]The Court considered a wide swath of cases from this Circuit in coming to the above conclusion. It appears that the disposition of motions for the remittitur of emotional damages varies widely from case to case. See, e.g., Forsyth, 91 F.3d at 774 (court upheld award of $100,000.00 in light of plaintiff's testimony of depression, weight loss, intestinal troubles, marriage problems, and consultation of psychologist); Migis, 135 F.3d at 1045-47 (court upheld $5,000.00 award based on plaintiff's uncorroborated testimony of inconvenience, low self-esteem, anxiety, crying, marital problems, and sleeplessness); Williams v. Trader Publishing Co., 218 F.3d 481, 486-87 (5th Cir. 2000) (court upheld award of $100,000.00 based on plaintiff's testimony of severe emotional distress, sleep loss, severe weight loss, and smoking); Vadie v. Miss. State Univ., 218 F.3d 365, 375-78 (5th Cir. 2000) (court remitted award of $300,000.00 to $10,000.00, based on plaintiff's uncorroborated testimony of emotional distress with physical manifestations); Giles, 245 F.3d at 488-89 (court remitted $300,000.00 award to $150,000.00 based on testimony from plaintiff and plaintiff's co-worker of sleep loss, headaches, marriage trouble, and loss of prestige); Salinas, 286 F.3d at 831-33 (court remitted $300,000.00 award to $150,000.00, based on plaintiff's detailed description of emotional harm and physical manifestations which was corroborated by his wife's testimony and medical bills); Tureaud, 294 Fed. Appx. at 916 (court upheld $140,000.00 award based on plaintiff's uncorroborated testimony of embarrassment, pain, weight gain, and stress, and described award as the "high end" of the spectrum).

Of course, "[j]udgments regarding noneconomic damages are notoriously variable," and inherently subjective in nature. Forsyth, 91 F.3d at 774. None of the cases cited above is an exact factual match to the case *sub judice*. As such, the case law of this jurisdiction "commands strong deference to the jury." Salinas, 286 F.3d at 832. The Court further notes that even if it were to remit the jury's award to $140,000.00 - the "high end" of the spectrum - and then apply a 150% multiplier, the result would be a figure that exceeds the jury's original award of $200,000.00. Tureaud, 294 Fed. Appx. at 916; Thomas, 297 F.3d at 369.

## V. Conclusion

For the reasons stated above, Defendant's Renewed Motion for Judgment as a Matter of Law is **DENIED**, and Defendant's Motion for a New Trial is **DENIED**.

Defendant's Motion for Remittitur is **GRANTED IN PART AND DENIED IN PART**. The jury's award of $100,000.00 in back pay to Plaintiff shall be remittted to $85,415.64, less an additional amount in retirement benefits contributed by Defendant to be determined by the Court after the parties have briefed the issue. The parties shall submit their briefs and documentation within fifteen (15) days of the entry of the Order accompanying this Opinion. Defendant's Motion for Remittitur is denied with respect to the emotional damages award.

The Court will address Plaintiff's Motion for Back Pay through the date of final judgment and Motion for Front Pay [116] upon determination of the amount of Plaintiff's retirement benefits contributed by Defendant. In their briefing on the outstanding retirement benefits issue, the parties shall also address the application of that issue to Plaintiff's pending motion.

An Order in accordance with this Opinion shall issue on this the 2nd day of November, 2009.

/s/ Sharion Aycock
**UNITED STATES DISTRICT JUDGE**